UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Anagram International, Inc., and
SATB Holdings, LLC,

        Plaintiffs,

v.

Mayflower Distributing Company
and Pioneer Balloon Company,

        Defendants;

and

Pioneer Balloon Company,

        Counter-Claimant,

v.

Anagram International, Inc., and
SATB Holdings, LLC,

        Counter-Defendants.

Civil No. 07-1142 (DWF/SRN)

**MEMORANDUM
OPINION AND ORDER**

_____

David J. Sheehan, Esq., and Jason S. Oliver, Esq., Troutman Sanders LLP; and Lindsey D. Saunders, Esq., and Michael M. Lafeber, Esq., Briggs & Morgan, PA, counsel for Plaintiffs and Counter-Defendants.

J. Derek Vandenburgh, Esq., and Rachel C. Hughey, Esq., Carlson Caspers Vandenburgh & Lindquist; and Mark D. Hinderks, Esq., Mark J. Peterson, Esq., Nora M. Kane, Esq., Penny R. Slicer, Esq., and Victoria L. Smith, Esq., Stinson Morrison Hecker LLP, counsel for Defendants and Counter-Claimant.

_____

**INTRODUCTION**

This matter came before the Court on February 7, 2008, on the issue of patent claim construction pursuant to *Markman v. Westview Instruments, Inc.*, 517 U.S. 370 (1996).

**BACKGROUND**

This litigation involves allegations by Plaintiffs Anagram International, Inc., and SATB Holdings, LLC (collectively, "Anagram") that Defendants Pioneer Balloon Company ("Pioneer") and Mayflower Distributing Company ("Mayflower")[1] infringed Claims 10-12 of U.S. Patent No. 7,177,434 (the "'434 Patent"). Pioneer has asserted counterclaims of non-infringement, invalidity, and unenforceability due to inequitable conduct.

Here, Anagram requests that the Court construe two terms of Claim 10 of the '434 Patent; Pioneer requests that the Court construe five terms. The parties agree that the Court need not construe Claims 11 and 12 of the '434 Patent.

**I.     Claim Construction Principles**

Patent claim construction, *i.e.*, the interpretation of the patent claims that define the scope of the patent, is a matter of law for the court. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 970-71 (Fed. Cir. 1995), *aff'd,* 517 U.S. 370 (1999). Proper claim construction requires an examination of the intrinsic evidence of record,

---

[1]     According to the Parties' Joint Proposed Claim Construction Statement (Doc. No. 29), Mayflower was never served and thus never filed an answer to this action. As a result, the Court will only address the claim construction in relation to the arguments made by Pioneer.

including the claims of the patent language, the specification, and the prosecution history. *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996). The terms used in the patent are presumed to carry "the meaning that the term would have to a person of ordinary skill in the art at the time of the invention." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005) (*en banc*) (citation omitted), *cert. denied*, 126 S. Ct. 1332 (2006). The specification is "the single best guide to the meaning of a disputed term." *Id*. at 1315. The specification may prescribe a special definition given to a claim term, or a disavowal of claim scope by the inventor. *Id*. at 1316. In such cases, the inventor's intention that is expressed in the specification is dispositive. *Id*. The court may use a dictionary or technical treatise to "assist in understanding the commonly understood meaning" of a term, so long as any meaning found in such sources does not contradict the definition that is found in the patent documents. *Id*. at 1322-23. In addition, the court may not import limitations from the specification into the claims. *Id*. at 1323.

## II.    The '434 Patent

The '434 Patent, entitled "Stepped Sound Producing Module," was issued on February 13, 2007. ('434 Patent at cover page.) The Patent describes a generally pyramid-shaped sound module that is attachable to a balloon for producing hi-fidelity sound effects. (*Id*. at Abstract.) The application that eventually issued as the '434 Patent was filed with the United States Patent and Trademark Office ("PTO") on January 18, 2002. (*Id*. at cover page.)

Five terms are in dispute from Claim 10 of the '434 Patent. Claim 10 reads as follows:

> 10. A sound module comprising:
> a speaker;
> an amplification device arranged to space the speaker from an inflatable object so as to form a cavity between an interior of the amplification device and the inflatable object, the amplification device being attached to the inflatable object, the inflatable object having an interior bounded by walls; and,
> a circuit configured to generate audio signals and being electrically coupled to the speaker, the speaker being configured and arranged to convert the audio signals into sound that resonates off the walls within the interior of the inflatable object.

('434 Patent c. 6, ll: 7-19.)

### A. "speaker"

The parties dispute the meaning of the term "speaker" as it appears in Claim 10 of the '434 Patent. Anagram contends that the term should be construed as "an electro-mechanical or piezoelectric element sound reproduction device." (Joint Proposed Claim Construction Statement at 3.) Pioneer, on the other hand, asserts that the Court should construe "speaker" as:

> A piezoelectric element including a crystal that produces electricity when flexed, or flexes when an electrical current is applied. The crystal is mechanically bonded to a "carrier plate." By applying an alternating current to the piezoelectric element, sound can be produced. The speaker does not employ an electro-mechanical sound reproduction device.

(*Id.*) Thus, the heart of the dispute among the parties is whether a "speaker," as used in Claim 10, can encompass both an electro-mechanical element *and* a piezoelectric element, as Anagram contends, or if its construction is limited to only a piezoelectric element, as Pioneer asserts.

4

In support of its construction, Anagram points to the specification and the prosecution history of the '434 Patent.  First, Anagram points to the Background of the Invention, which states:

> Electro-mechanical sound reproduction devices have been employed since the early days of cylindrical wax recordings.  Simply stated, a membrane of some sort is used in a piston action to mechanically move air, creating sound waves audible to the listener.  The electro-mechanical "speaker" is the result of many years of engineering, in which a paper or plastic cone is affixed to a coil of wire.  The coil is supplied with an iron core, and surrounded by a magnet.  This arrangement surrounds the wire in a magnetic field, forming an electro-magnet.  When an alternating current (AC) signal is applied to the coil, the coil moves with a piston action (back and forth).  This moves the attached cone, pushing air, creating sound.  This arrangement results in high quality sound reproduction, but is very heavy and requires a large amount of power to achieve audible sound levels.
>
> A different form of sound producer is available known as a "piezoelectric element".  Piezoelectric elements are small, very lightweight, and require relatively low power to produce sound.  The piezoelectric element includes a crystal that produces electricity when fixed, or flexes when an electrical current is applied.  The crystal is mechanically bonded to a "carrier plate", typically a small, thin brass disk.  By applying an alternating current to the piezoelectric element, sound can be produced.
>
> Because of the nature of the piezoelectric element, however, it is only capable of producing certain narrow band frequencies efficiently.  Typically, piezoelectric elements are used for producing single tones at a "resonant frequency" (the frequency at which they require the lowest amount of power to produce the highest sound level).  Different piezoelectric elements have different resonant frequencies.
>
> However, conventional piezoelectric sound producing modules suffer from a number of drawbacks.  They do not provide hi-fidelity sound, the volume is generally very low, and the sound quality is very poor.  Devices that do produce hi-fidelity sound quality are generally too heavy for attaching to a balloon and require too much power to drive the device.
>
> Accordingly, it would be advantageous to produce a sound module, which employs piezoelectric elements.  It would further be advantageous to produce such a sound module that is designed to:  be attached to a balloon,

>provide hi-fidelity sound, provide higher volume, reproduce prerecorded sound, and maintain sound quality even as the balloon begins to deflate.

('434 Patent c. 1, ll: 21-67.) Anagram argues that Pioneer has inappropriately attempted to limit the claims to the preferred embodiment. Anagram asserts that because the Background of the Invention discloses an electro-mechanical speaker, the "speaker" of Claim 10 should not be limited to a piezoelectric element. Moreover, Anagram notes that the '434 Patent consistently defines the invention as a "sound module" and that "various modifications, additions and subtractions can be made without departing from the spirit or scope of the claims." (*Id*., c. 2, ll: 53-55.) Thus, Anagram contends that the Court's claim construction should not foreclose a reading of "speaker" that allows for either an electro-mechanical or a piezoelectric element.

Conversely, Pioneer asserts that the term "speaker" should be limited to a sound reproduction device that employs only a piezoelectric element. Pioneer points out that every description of the invention includes reference to a sound module that employs a piezoelectric element to produce sound. Specifically, Pioneer points to the following portions of the Brief Summary of the Invention:

>The present invention provides a sound module attachable to an object. The sound module includes a piezo amplification device having a top and a bottom and an interior. A piezoelectric element is connected to the piezo amplification device substantially at the top of the piezo amplification device. The piezo amplification device is attachable to the object at the bottom of the piezo amplification device. When the piezo amplification device is attached to the inflatable object, the interior of the piezo amplification device and the inflatable object form a cavity.
>
>Another aspect of the invention provides a sound module attachable to an object. The sound module includes a piezoelectric element and a piezo amplification device module for housing the piezoelectric element

6

>and for attaching the piezoelectric element to the inflatable object. The sound module also includes a circuit module electrically connected to the piezoelectric element for generating audio signals. The piezoelectric element is configured to convert the audio signals generated by the circuit module into sound that resonates within the object.
>
>Still another aspect of the invention provides a method of producing sound that resonates within an object. The method includes housing a piezoelectric element at substantially the top of a piezo amplification device and electrically connecting a circuit designed to produce audio signals to the piezoelectric element.
>
>. . .
>
>Another aspect of the invention provides a sound module attachable to an inflatable object. The sound module includes a semi-rigid pyramid shaped piezo amplification device having a top, a bottom and an interior. . . . A piezoelectric element is connected to one of the rings at the top of the piezo amplification device and an electrical circuit is electrically connected to the piezoelectric element.

('434 Patent c. 2, ll: 3-47.) Pioneer also notes that the Detailed Description of the Invention always describes the sound module as including a piezoelectric element. (*See id*., c. 3, ll: 17, 26, 29, 32, 33, 35-36, 41, 42, 49, 57; c. 4, ll: 31-32, 47.) Pioneer correctly asserts that there is no other reference or suggestion to an electro-mechanical device in the specification.

Pioneer further asserts that, based on the language in the Background of the Invention, the patentee disavowed any use of an electro-mechanical sound reproduction device. Specifically, Pioneer notes that the only reference to an electro-mechanical speaker appears in the Background of the Invention, where the inventor describes the downfalls of the electro-mechanical speaker in this application: namely, that the electro-mechanical speaker is "generally too heavy for attaching to a balloon and

7

require[s] too much power to drive the device." (*Id*., c. 1, ll: 59-60.)  Pioneer contends that because this language references only the disadvantages of the electro-mechanical speaker, the patentee intended to distinguish electro-mechanical devices from piezoelectric devices and intended to utilize a piezoelectric, not an electro-mechanical, element in Claim 10.

In response to Pioneer's "disavowal" argument, Anagram raises the prosecution history of the '434 Patent to support its construction of the term "speaker."  Anagram contends that the prosecution history shows a clear intent to broaden the claims beyond merely a piezoelectric element because the patentee specifically eliminated all reference to the term "piezoelectric."

> Claim 11 (which issued as claim 10) was initially submitted as follows:
>
> A sound module attachable to an object, the sound module comprising:
> a piezoelectric element;
> piezo amplification means for housing the piezoelectric element and for
>     attaching the piezoelectric element to the object; and,
> circuit means electrically coupled to the piezoelectric element for
>     generating audio signals;
> wherein the piezoelectric element is configured to convert the audio signals
>     generated by the circuit means into sound that resonates within the
>     object.

(Declaration of Jason S. Oliver in Supp. of Pls.' Anagram Int'l Inc.'s and SATB Holdings, LLC's Opening Claim Construction Br. ("Oliver Decl.") ¶ 5, Ex. 3 ("File History") at S0134-135.)  In an Office Action Summary dated July 18, 2005, the Examiner rejected then-Claim 11, among others. (*Id*. at S0090-91.)  The Examiner stated:

8

> Regarding Claim 11, Park discloses a sound module (Fig. 12) attachable to an object, the sound module comprising: a piezoelectric element (1132); piezo amplification means (1120) for housing the piezoelectric element and for attaching the piezoelectric element to the object (1110); and, circuit means (Fig. 11, circuit 1140) electrically coupled (1142) to the piezoelectric element for generating audio signal; wherein the piezoelectric element is configured to convert the audio signals (Col. 7, lines 43-45) generated by the circuit means into sound that resonates within the object (1110).

(*Id.*)

In an August 11, 2005 Reply to the Examiner's July 25, 2005 Office Action, then-Claim 11 was amended to delete the specific phrase "piezoelectric element" in favor of the term "speaker." (File History at S0070, S0073.) In addition, the applicant changed "piezo amplification means" to "amplification device." (*Id.* at S0082.) Thus, all references to the term "piezo" were deleted from then-Claim 11. (*Id.* at S0070, S0082.)

This amended claim was rejected based on prior art (the Margolis reference) on December 2, 2005. (*Id.* at S0056-0060.) Then, on June 7, 2006, the applicant filed another amendment that included the language "so as to form a cavity between an interior of the piezo amplification device and the inflatable object." (*Id.* at S0048.)[2] The Examiner responded with an Advisory Action on June 23, 2006, indicating that the amendment would not be entered because it "change[d] scope of the invention requiring further search and consideration." (*Id.* at S0041.) On October 16, 2006, the applicant's

---

[2] In a declaration provided to the Court following oral argument on this matter, Anagram's counsel Richard M. Lehrer asserted that in the June 7, 2006 amendment, he "simply 'cut-and pasted' the proposed language ('so as to form a cavity between an interior of the piezo amplification device and the inflatable object') and forgot to remove the word piezo from the copied portion." (Decl. of Richard M. Lehrer in Supp. of Pls.' Proposed Claim Construction ¶ 6.)

9

counsel had a telephone interview with the Examiner, after which the Examiner agreed to amend then-Claim 11 to delete the word "piezo." (*Id*. at S0034.) Thereafter, the Examiner filed a Notice of Allowability that stated, "[t]his is to correct the antecedent basis of 'the amplification device' appears in line 4 of claim 11." (*Id*. at S0032.) In a subsequent Interview Summary dated January 3, 2007, the Examiner stated that during his interview with the applicant's counsel:

> Applicants pointed out to the Examiner that there was a typographical informality present in claim 11, line 4. Applicants requested that the word 'piezo' be deleted from claim 11, line 4. The Examiner agreed and stated that he will amend claim 11, as suggested by Applicants, via Examiner's amendment.

(*Id*. at S0024-0025.) Ultimately, the '434 Patent issued on February 13, 2007.

Based on the language of the specification and the prosecution history of the '434 Patent, the Court is left with three possible approaches to the construction of the term "speaker." First, the Court considered construing "speaker" very narrowly, as Pioneer suggests, to only include reference to a piezoelectric sound reproduction device. The Court agrees with Pioneer that the specification supports this construction, in that it only describes embodiments that utilize a piezoelectric sound reproduction device. Yet such a construction fails to acknowledge the prosecution history, and particularly the fact that the Examiner allowed the applicant to broaden the language of the claim beyond just a piezoelectric element. Moreover, the Court believes that such a construction improperly incorporates an infringement analysis into the claim construction.

A second approach the Court considered was to construe the term "speaker" to refer only to an electro-mechanical sound reproduction device, a possible construction

10

that the parties have not raised.  Notably, the only mention of the term "speaker," aside from Claim 10, is in the Background of the Invention, where the phrase "electro-mechanical 'speaker'" occurs.  ('434 Patent c. 1, ll: 25-26.)  Arguably, when the applicant deleted all references to "piezo" in response to the Park rejection (see File History at S0070, S0082), it could be inferred that the applicant intended to overcome the rejection by removing all reference to a piezoelectric device and to merely write the claim to cover an electro-mechanical sound reproduction device.  This construction would preserve the validity of the claim to some extent.  Yet, if the Court were to construe the term as to only refer to an electro-mechanical device, it raises a separate issue as to whether the patent actually enables the invention of an electro-mechanical sound reproduction device.

     The third approach, which to some extent Anagram proposes, is to construe the term "speaker" to include both electro-mechanical and piezoelectric sound reproduction devices.  This approach gives deference to the broad language of Claim 10 itself—a claim that, somewhat nonsensically, the Examiner allowed to be broadened in response to the rejection that the claim was anticipated by Park.  Although this construction appears to be the most plausible in light of the claim language and the prosecution history, the Court notes that it ultimately may suffer from fatal defects.  For instance, it could still be argued that if the language was indeed broadened in light of the Park rejection, as Anagram suggests, the claim is still invalid as anticipated in light of Park.  In addition, it could be argued that the claim itself does not enable the invention of an

electro-mechanical sound reproduction device. But here, the Court is not asked to opine on the validity of the '434 Patent, and the Court will leave this discussion for another day.

With these considerations in mind, the Court concludes that the term "speaker" is properly construed as a "sound reproduction device."

### B. "sound module"

Pioneer asks the Court to construe the term "sound module" as it appears in Claim 10. Pioneer asserts that "sound module" should be construed as "a sound producer employing a piezoelectric element to produce sound." (Joint Claim Construction Statement at 2.) Anagram contends that no claim construction of this term is required, as "sound module" is not an element of the claim. (*Id.*)

The Court concludes that "sound module" requires no independent construction as it appears in Claim 10 of the '434 Patent. "Sound module" appears only in the preamble of Claim 10 and, as a result, is defined by the terms that follow. Pioneer's proposed construction attempts to impart limitations to the term "sound module" from the preferred embodiment. The Court declines to adopt such a construction.

### C. "piezoelectric element"

Pioneer asks the Court to construe the term "piezoelectric element" as it appears in the specification. Although Pioneer offers no specific construction, it contends that assigning a definition to the term will assist the fact finder in its analysis.

The Court, however, respectfully declines to construe the term "piezoelectric element." Primarily, the Court notes that the term does not appear in Claim 10. It is the Court's duty to construe the claim terms to define the scope of the patent, not to define

12

words that appear merely in the specification in order to limit the scope of the claim language.  As a result, the Court need not construe "piezoelectric element" at this time.

### D.     "amplification device"

The term "amplification device" appears in Claim 10 of the '434 Patent.  Anagram asserts that the term should be construed as "a series of one or more interconnected rings of increasing diameter stacked one on another, wherein a cone shape is considered to be an infinite number of concentrically stacked rings of varying sizes."  (Joint Claim Construction Statement at 4.)  Pioneer, on the other hand, suggests that "amplification device" be construed as "a device which increases the volume of the sound that has been produced by the piezoelectric element to a degree discernable to the human ear."  (*Id*.)

In support of its proposed construction, Anagram points to the following language from the specification:

> It has been determined that by forming a series of interconnected concentric rings of increasing diameter, and stacking these rings one on another, operation of the piezoelectric element 20 is enhanced at frequencies other than only the resonant frequency.

('434 Patent c. 3, ll: 54-57.)   In response, Pioneer contends that Anagram's proposed construction does not require that the device actually amplify sound and thus fails to give any meaning to the word "amplification."

Pioneer asserts that one drawback of a conventional piezoelectric sound-producing module that the invention of the '434 Patent sought to overcome was the fact that conventional piezoelectric modules "do not produce hi-fidelity sound, the volume is generally very low, and the sound quality is very poor." (*Id*., c. 1, ll: 55-58.)  Pioneer

13

points to the Background of the Invention, which notes that "it would be advantageous to produce a sound module, which employs piezoelectric elements . . . that is designed to . . . provide hi-fidelity sound, provide higher volume . . . and maintain sound quality even as the balloon begins to deflate." (*Id*., c. 1, ll: 61-67.) In addition, Pioneer asserts that the specification indicates that the manner in which the amplification device is constructed allows for "controlling the volume of the sound produced." (*Id*., c. 3, ll: 47-66.)

In response to Pioneer's assertions, Anagram contends that Pioneer has attempted to impart limitations into the claim that are not supported by the claim or specification. Specifically, Anagram asserts that the degree of amplification required by the device is absent from the specification and claim language. In addition, Anagram contends that Pioneer improperly attempts to read a piezoelectric element into the definition of "amplification device."

The Court finds that Anagram has properly identified the concentric-ring structure in the specification that defines the device of the term "amplification device." But Anagram's definition fails to provide meaning to the term "amplification." Although the Court concludes that the "amplification device" does need to increase sound volume, the Court does not find any support for Pioneer's suggestion that the amplification device should increase the sound volume to a degree discernible to the human ear. For these reasons, the Court concludes that the term "amplification device" is properly construed as "a series of one or more interconnected concentric rings of increasing diameter stacked

one on another, wherein a cone shape is considered to be an infinite number of concentrically stacked rings of varying size, that amplify (or increase) sound."

### E. orientation of the "amplification device"

Pioneer requests construction of the phrase "[a]n amplification device arranged to space the speaker from an inflatable object so as to form a cavity between an interior of the amplification device and the inflatable object." The parties dispute the structural arrangement of the phrase, specifically the spacing of the speaker from the inflatable object. Anagram contends that this element requires no further construction once "speaker" and "amplification device" are properly construed. (Joint Claim Construction Statement at 4, 5.) Pioneer asserts that the Court should adopt the following claim construction:

> The amplification device spaces the piezoelectric element from the inflatable object such that the piezoelectric element is not in direct contact with the inflatable object. The amplification device has an interior and is arranged to create an enclosed space between the interior of the amplification device and the inflatable object. The piezoelectric element is oriented with respect to the enclosed space so as to cause the majority of the sound produced by the piezoelectric element to pass through the enclosed space.

(*Id.*) In addition, Pioneer contends that the language of Claim 10 stating "the amplification device being attached to the inflatable object" should be construed as "the amplification device and the inflatable object are joined and in direct contact." (*Id.*)

In support of its assertion that the device form a cavity so that the speaker is not in direct contact with the inflatable object, Pioneer notes that the Abstract of the invention states: "The pyramid shape allows the piezoelectric element to be coupled to the balloon

15

without physically touching the balloon surface. Thus, even when the balloon begins to deflate, the sound quality of the sound module can be maintained." ('434 Patent, Abstract.) To support its proposed construction that the amplification device has an interior and is arranged to create an enclosed space between the interior of the amplification device and the inflatable object, Pioneer points to the following language from the specification: "When the piezo amplification device is attached to the inflatable object, the interior of the piezo amplification device and the inflatable object form a cavity." (*Id*., c. 2, ll: 9-12.)

In addition, Pioneer asserts that the majority of sound produced by the speaker passes through the cavity or enclosed space. Pioneer relies on the patentee's amendment to require the formation of "a cavity between an interior of the piezo amplification device and the inflatable object." (File History at S0048.) Pioneer also notes that the specification describes "the piezoelectric element . . . configured to convert the audio signals into sound that resonates within the inflatable object." ('434 Patent c. 2, ll: 39-50.) Pioneer contends that the majority of the sound waves emanate through the cavity because the carrier plate 80 of the piezoelectric element 20 is attached to the amplification device in a manner that allows the vibrational movement of the crystals to transfer to the walls of the device.

Finally, Pioneer suggests that the Court should construe the claim language "the amplification device being attached to the inflatable object" as requiring direct contact between the two. Pioneer points to the language, noted above, regarding the formation of

the cavity between the amplification device and the inflatable object.  (*Id*., c. 2, ll: 42-44).

Pioneer also notes that the specification describes the special relationship as follows:

> The sound module 10 is attached by securing the bottom portion of the piezo amplification device 30 to the balloon 50 with glue or in some other manner.  When the piezo amplification device is secured to the balloon 50 a cavity is formed between the piezo amplification device 30 and the balloon 50.

(*Id*., c. 4, ll: 40-45.)  Thus, Pioneer asserts that the amplification device and the inflatable object must be directly joined in order to form the cavity between the amplification device and the inflatable object.

The Court finds little support for Pioneer's suggestion that the disclosed speaker is not in direct contact with the inflatable object.  Instead, the Court agrees with Anagram that the Patent specification does not require that the speaker must never be in direct contact with the inflatable object.

Second, the Court finds that the specification and the prosecution history do not require that the cavity be an "enclosed space."  As illustrated in Figure 7 of the '434 Patent, and as noted in the specification, "one or more of the rings could have holes therein."  ('434 Patent c. 5, ll: 1-2; fig. 7.)  Therefore, the specification allows for a construction that does not require the space between the interior of the amplification device and the inflatable object to be completely enclosed.  Thus, the Court rejects Pioneer's assertions in this regard.

The Court similarly rejects Pioneer's proposal that the majority of the sound be passed through the cavity or enclosed space.  The Court finds no support in the

17

specification, prosecution history, or the ordinary meaning of the terms to adopt such a construction.

Finally, the express language of the specification belies Pioneer's proposed construction requiring direct contact between the amplification device and the inflatable object. The specification specifically notes that the amplification device can be connected "with glue or in some other manner." (*Id.*, c. 4, ll: 40-42.) Thus, the claim language does not disavow methods other than a direct connection between the amplification device and the inflatable object.

Based on the above, the Court concludes that the intrinsic evidence does not support Pioneer's proposed construction. Accordingly, the Court declines to adopt Pioneer's construction and does not construe the terms that discuss the orientation of the speaker, the amplification device, and the inflatable object of Claim 10.

### III.  Motion to Strike

By letter brief dated February 15, 2008, Pioneer requested that the Court strike Anagram's February 15, 2008 Response as non-responsive and contrary to the Court's request for additional briefing. Because the Court has not relied on Anagram's Response in construing the claims at issue here, Pioneer's motion to strike is denied as moot.

Therefore, **IT IS HEREBY ORDERED** that:

1. The claims at issue are construed as set forth in this Order.

2.	Defendant's Motion to Strike (Doc. No. 49) is **DENIED AS MOOT**.


Dated:  April 3, 2008				<u>s/Donovan W. Frank</u>
						DONOVAN W. FRANK
						Judge of United States District Court